(October 9, 2012)

■ MARK KOMLOSI, Respondent, v ANDREW M. CUOMO, as Attorney General of the State of New York, et al., Appellants. [952 NYS2d 488]—

Petitioner Mark Komlosi, as receiver for nonparty Melanie Fudenberg, commenced this proceeding to compel the state respondents to indemnify Fudenberg for a judgment that was rendered against her in a federal action that Komlosi, in his individual capacity, had brought pursuant to 42 USC § 1983 alleging, inter alia, malicious prosecution (*see Komlosi v Fudenberg*, 2000 WL 351414, 2000 US Dist LEXIS 4237 [SD NY, Mar. 31, 2000, No. 88 Civ 1792 (HBP)]). That action arose after Fudenberg falsely accused Komlosi of having sexually abused a mentally disabled resident of a facility at which both worked in 1985.

The State's determination declining to indemnify Fudenberg is supported by a rational basis (*see Matter of Pell v Board of*

*Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County*, 34 NY2d 222, 231 [1974]). The jury's finding that Fudenberg "knew with absolute certainty" that the allegations of sexual misconduct between Komlosi and the mentally disabled resident were false rationally supports the State's conclusions that Fudenberg was acting beyond the scope of her employment, and that she was engaged in intentional wrongdoing (*see* Public Officers Law § 17 [3] [a]; *Dykes v McRoberts Protective Agency*, 256 AD2d 2 [1998]).

Komlosi's argument that the Attorney General is estopped from arguing that Fudenberg's acts fell beyond the scope of her employment is unavailing. The Attorney General's prior position was proffered during its defense of Fudenberg, and the State's duty to defend is broader than the duty to indemnify (*see Matter of LoRusso v New York State Off. of Ct. Admin.*, 229 AD2d 995 [1996]; *see also Matter of Barkan v Roslyn Union Free School Dist.*, 67 AD3d 61, 67 [2009]).

Komlosi's argument, as Fudenberg's receiver, adopted by the dissent, that the jury's finding in the federal action (*see Komlosi v New York State Off. of Mental Retardation & Dev. Disabilities*, 1990 WL 29352, 1990 US Dist LEXIS 2659 [SD NY, Mar. 12, 1990, No. 88 Civ 1792 (JFK)]) was based on an erroneously worded and expansive interrogatory, was not preserved by any party at the trial. At trial, counsel for both sides negotiated the words to be used in the verdict sheet, and neither objected when the court submitted the final interrogatory to the jury. Further, the interrogatory comported with the theory of the case of intentional conduct that Komlosi proffered at trial.

Moreover, irrespective of the jury's finding in the federal action, the State's determination, made pursuant to Public Officers Law § 17 (3) (a), that Fudenberg engaged in intentional wrongdoing has ample support in the record. The irrefutable fact remains that the sexual abuse charges that resulted in Komlosi's arrest and indictment were dropped in the middle of the trial when the alleged victim, Rosenberg, revealed to the prosecutor that Fudenberg had forced him to lie about them. The dissent, however, argues that Rosenberg's recantation is not credible because "he did not respond at all to the question of *how* she forced him" to lie. But the dissent cannot seriously argue that such recantation was not credible when it forced the prosecution to drop the sexual abuse charges against Komlosi. Under the circumstances, it cannot be said that the Attorney General lacked a factual basis to discredit Fudenberg's allegations, as noted by the dissent, that she "sincerely, [but] misguidedly, believed that by leading [the alleged victims] to press what

she perceived as their legitimate grievances of sexual abuse[s], she was protecting them."

We have reviewed the remaining contentions and find them unavailing. Concur—Sweeny, Renwick and DeGrasse, JJ.

Saxe, J.P., dissents in a memorandum as follows: The question we must answer on this appeal is whether the State should be required to indemnify former state employee Melanie Fudenberg for a $2,372,988 judgment that plaintiff Mark Komlosi obtained against her for actions she took in the course of her employment as a state Mental Hygiene Therapy Aide. I would require the State to do so. The rationale provided by the State to justify its refusal is insufficient and an improper basis for that refusal. When the complete record is considered, it is apparent that Fudenberg's conduct indeed fell within the parameters of Public Officers Law § 17 (3) (a), and therefore the State should pay Komlosi's judgment.

Komlosi was working as a psychologist for the New York State Office of Mental Retardation and Developmental Disabilities (OMRDD) for several years when, in 1982, he was assigned to the Williamsburg Rehabilitation and Training Center (WRTC), a residential facility for developmentally disabled adults. This proceeding arises out of an ultimately-dismissed criminal prosecution brought against him in 1985 based on allegations that he had sexually abused one of the residents at WRTC.

David Rosenberg, the complainant in the dismissed criminal prosecution, is a developmentally disabled adult resident at WRTC, with an IQ of approximately 72 and a complex clinical diagnosis that included a tendency to fabricate stories and a preoccupation with sex that regularly prompted him to leave the facility without permission and attend pornographic films at 42nd Street movie theaters.

Melanie Fudenberg was employed at WRTC at the time in the job title of Mental Hygiene Therapy Aide. It was she and two other staff members who brought the criminal charge of sexual abuse that David Rosenberg made against Komlosi to the attention of supervisory personnel, although this was not the first such complaint that Fudenberg brought to supervisory attention. To understand the dynamic that led to the criminal complaint, it is necessary to discuss the previous incidents in which Fudenberg brought to the attention of senior administrative staff purported abuse by Komlosi, and to note that Komlosi was cleared after investigation in each instance.

On August 14, 1984, Fudenberg accompanied a resident named Marion Greengrass to the WRTC Chief of Services, Arthur Fogel, and Greengrass told Fogel that Komlosi had sex

with her. After Komlosi was placed on administrative leave, the charge was investigated, and was ultimately determined to have been fabricated. Investigator George Young reported that Greengrass denied having had sex with Komlosi, but stated that Fudenberg told her to say she had.

During August 1984, Fudenberg also brought WRTC resident Michael Sakowitz to Fogel's office, where Sakowitz said that Komlosi had sexually abused him, using masturbatory hand gestures to demonstrate. However, when Fudenberg left Fogel's office, Sakowitz denied having been sexually abused, and said Fudenberg told him to get Komlosi in trouble. No administrative leave or other discipline resulted from this report.

But Fudenberg was not chastened or deterred by these determinations; on the contrary, she continued to press them. In November 7, 1984, she approached Ivan Canuteson, OMRDD Associate Commissioner of Program Operations, while he was visiting the facility, to express her concerns and make complaints about what she perceived to be poor care and treatment of a number of residents, including her concern that inadequate investigations had been made into the previous claims of sexual misconduct by Komlosi.

Canuteson then set a further inquiry in motion. An intradepartmental memo from Kenneth Brodsky, Deputy Director, indicates that he interviewed Fudenberg at length, and listed her complaints. In addition to her renewed complaints about what she believed to be Komlosi's sexual misconduct, her allegations included charges against the facility's medical staff about their treatment and handling of some residents, and an accusation that a resident who fell out a window and died was actually intentionally murdered, along with speculation about staff members who could be behind the purported homicide. With regard to her assertions against Komlosi, Fudenberg elaborated that he had allowed a resident named Anthony Ford to beat him up because Komlosi enjoys being beaten, and that she saw him allowing another resident, Lee Pierce, to touch his penis. She accused Komlosi of locking his office door when seeing clients in order to privately obtain sexual favors from them, and expressed her belief that Komlosi paid the clients for those sexual favors with trips for coffee and rolls from a nearby bakery. She pointed out that Greengrass had claimed that she "had fun with" Komlosi.

Client Rights Specialist Lovetts Joyner then conducted the follow-up investigation on January 8, 1985. Once again, the allegations of sexual abuse against Komlosi were found to be unsubstantiated. Joyner reported that it is a common practice

among the agency's psychologists to close their doors during client counseling sessions. He interviewed all the residents and found no foundation for any of the accusations. As to Greengrass, she told him Komlosi used to take her to the store for coffee and rolls as a treat, and had always been very nice to her, and that she had dreams about having sex with him, but, she denied having actually had sex with him, and stated that Fudenberg had given her a cigarette and instructed her to say Komlosi had sex with her as a game.

Specialist Joyner concluded by recommending that this time, a formal letter of exoneration be placed in Komlosi's personnel file and that OMRDD Employee Relations be advised of Fudenberg's wrongful attempt to damage Komlosi's reputation and livelihood.

Instead, Fudenberg soon took part in spearheading a new accusation against Komlosi, beginning on March 11, 1985, when WRTC resident David Rosenberg stated, while in the presence of Fudenberg and two other therapy aides, that Komlosi had sexual contact with him. Fudenberg completed an incident report, indicating that David Rosenberg stated, in the presence of herself and two other staff members, William Guzman and Walter DeLeon, that "Mr. Molosi [sic] told me to touch his peanuts [sic], and he touched mine." DeLeon submitted a memorandum the next day indicating "I Walter De Leon heard David Rosenberg state that his genital area was touched by Mr. Komoloski [sic]. Rosenberg also stated that Mr. Komoloski [sic] touched his face and said nice little Jewish boy." William Guzman submitted his own statement on March 12, 1985: "On the evening of 3/11/85 while sitting at the front desk on the 3rd floor, resident David Rosenberg stated to Ms. Fudenberg, Mr. DeLeon and myself that Mr. Komloski [sic] had touched his penis on several occasions. Mr. Rosenberg also said that Mr. Komloski [sic] had allowed David to touch and play with Mr. Komloski's [sic] penis. When questioned about the extent of Mr. Komloski's [sic] actions (e.g.: intercourse) Mr. Rosenberg said no."

Another psychologist at WRTC, Don Wiur, then interviewed David Rosenberg on March 12, 1985. His notes from this interview indicate that Rosenberg called Komlosi a "very nasty man" and said Komlosi "took me to his office and told me to suck his penis and I sucked his penis and [he] suck[ed] my penis back." Rosenberg told Wiur that Komlosi did not force him physically, but by his words alone. Although Wiur thought Rosenberg seemed sincere, one or two inconsistencies made during the interview made him uncertain of whether Rosenberg was telling the truth.

Investigator George Young then interviewed Rosenberg on March 13, 1985. At that interview, Rosenberg began by saying that Fudenberg came to him and asked him whether Mark Komlosi had sucked his penis, and that she forced him to say yes. However, when Young then asked, "Has Mark ever sucked your penis?" Rosenberg responded, "Yes, way back."

On March 13, 1985, Komlosi was once again placed on administrative leave pending investigation. This time, however, before the agency's investigation was completed, on March 22, 1985 the New York City Police Department asked the agency to stop its investigation, and proceeded with its own investigation. On March 25, 1985, Komlosi was informed that he was being suspended without pay due to charges that he sexually abused Rosenberg, and he was arrested on May 2, 1985 on those charges. On May 8, 1985, Komlosi was indicted on two counts of sodomy. He was incarcerated for 15 days, during which he was strip-searched and physically and sexually threatened by other inmates. He was also sent hate mail by readers of news articles that reported the charges. In one such news article, Fudenberg is quoted as describing how five residents spoke to her of having had sexual encounters with Komlosi and how "[w]hen nothing got done, I went to the cops." In a newsletter put out around the same time by Fudenberg's union, Fudenberg also repeated her assertions that the agency had failed to properly investigate the allegations of sexual abuse against Komlosi.

During the criminal trial in May 1986, although Rosenberg initially testified that Komlosi had sexually abused him, he thereafter told Fogel, and then the prosecution, that Fudenberg had "forced" him to claim the sexual abuse. The indictment was then dismissed. In September 1986, OMRDD reinstated Komlosi, with back pay, but Fudenberg and Rosenberg were still at the facility, and Komlosi found that he was unable to resume his duties, fearing a repeat of the past horrific experiences. He therefore resigned for health reasons; he had been diagnosed as suffering from post-traumatic syndrome disorder, was prescribed anti-depressants and anti-anxiety medication. When he sought reinstatement a year later, OMRDD said it did not have a position to offer him.

In March 1988, Komlosi commenced the underlying federal action against Fudenberg and numerous other state and city employees and agencies, alleging violations of his civil rights under 42 USC § 1983. Although the Office of the Attorney General said it could not itself represent Fudenberg, it certified to the Comptroller that Fudenberg was entitled to be represented by private counsel paid for by the State under Public Officers Law § 17.

The claims against all defendants other than Fudenberg were dismissed on various grounds before trial (*see Komlosi v New York State Off. of Mental Retardation & Dev. Disabilities*, 1994 WL 465993, 1994 US Dist LEXIS 11864 [SD NY, Aug. 23, 1994, No. 88 Civ 1792 (JFK)], *mod* 64 F3d 810 [2d Cir 1995]; *Komlosi v New York State Off. of Mental Retardation & Dev. Disabilities*, 1990 WL 29352, 1990 US Dist LEXIS 2659 [SD NY, Mar. 12, 1990, No. 88 Civ 1792 (JFK)]). The case proceeded to trial in May 1999 against Fudenberg as the sole remaining defendant.

The jury was instructed that for Komlosi to establish his claim against Fudenberg under 42 USC § 1983, he had to prove three elements by a preponderance of the evidence. First, that Fudenberg's complained-of conduct was committed while she was acting under color of state law, meaning that her conduct was made possible only because she was clothed in the authority of the state and her actions made possible by virtue of state law. The act must be of such nature and committed under such circumstances that it would not have occurred except for the fact that the defendant purported or pretended to be lawfully exercising her official power while in reality abusing it.

The second element of the section 1983 claim is that the conduct deprived Komlosi of federal rights, privileges or immunities; the three rights he claimed were violated were (1) to continued employment; (2) to be free to pursue the career of his choice without stigma; and (3) to be free from malicious prosecution. In order to establish a violation of the right to be free of malicious prosecution, the court explained, Komlosi was required to prove the following:

1. the commencement of a criminal proceeding by Fudenberg against Komlosi,

2. the termination of the criminal proceeding in his favor,

3. the absence of probable cause,

4. actual malice, and

5. a post-arraignment deprivation of personal liberty.

The jury was told that first element could be satisfied using several possible factual bases, including where "Ms. Fudenberg persuaded Mr. Rosenberg to make the complaint and that without Ms. Fudenberg's persuasion, Mr. Rosenberg would not have made the complaint *or* that Ms. Fudenberg, acting in bad faith, gave Mr. Rosenberg false information as a result of which Mr. Rosenberg made the complaint" (emphasis added). That is, for this element, it was *not* necessary to find that Fudenberg got Rosenberg to provide false information; simply persuading him to press the complaint was sufficient.

As to the third prong, the absence of probable cause, the court instructed the jury that "[t]he question on the issue of probable cause is not whether Mr. Komlosi was in fact guilty or innocent, or whether Ms. Fudenberg was in fact mistaken or correct, but rather, whether, on the facts known to or reasonably believed by Ms. Fudenberg, a reasonably prudent person would have believed Mr. Komlosi to be guilty."

The element of actual malice, needed to establish a violation of Komlosi's right to be free of malicious prosecution, was defined as "for a purpose other than bringing an offender to justice *or* out of personal ill will [or] if it is brought in reckless disregard of the rights of the person accused." So, this element could be satisfied without any finding that Fudenberg was acting out of personal animosity, if Fudenberg was found to have acted in reckless disregard for Komlosi's rights when she pressed Rosenberg to make his accusations.

The jury was then instructed about Fudenberg's affirmative defense of qualified immunity. The trial court charged the jury that Komlosi would be unable to succeed with his claim against Fudenberg if she proved that she was protected by qualified immunity, that is, "if, at the time she allegedly violated Mr. Komlosi's rights, she did not know with absolute certainty that the allegations of sexual misconduct between Mr. Komlosi and Mr. Rosenberg were false." In its explanation the court concluded that "if you find that Ms. Fudenberg was certain that these charges were false, either because she wrongfully caused Mr. Rosenberg to lie *or for some other reason*, then she is not entitled to qualified immunity" (emphasis added).

The jury was given a written verdict sheet with a number of interrogatories. The first three questions concerned the elements of Komlosi's section 1983 claim, properly framed so as to ask whether Komlosi had successfully proved by a preponderance of the evidence that (1) Fudenberg had acted under color of state law; (2) her actions violated his constitutional rights; and (3) those actions were the proximate cause of Komlosi's injuries; the jury answered these questions in the affirmative.

The fourth question, and the jury's answer to it, is the crux of the present dispute, and it requires careful consideration. It concerns whether Fudenberg was protected by a qualified immunity. However, unlike the first three questions, the fourth interrogatory was not framed so as to ask whether Fudenberg had proved her affirmative defense of qualified immunity by a preponderance of the evidence. Rather, although the court had instructed the jury that it was Fudenberg's burden to prove "that she did not know with certainty that the charges against

Mr. Komlosi were false," the interrogatory did more than ask the jury whether Fudenberg had or had not proved the defense. It actually asked the jury to make an affirmative finding *either way* regarding her knowledge of the falsity of the charge, by checking off one of the two offered options. Specifically, the question reads:

"4. Based on all the evidence do you find that:

"(a) X Ms. Fudenberg knew with absolute certainty that the allegations of sexual misconduct between Mr. Komlosi and Mr. Rosenberg were false.

"(b) Ms. Fudenberg did not know with absolute certainty that the allegations of sexual misconduct between Mr. Komlosi and Mr. Rosenberg were false."

As indicated above, the jury checked off the box indicating that Fudenberg "knew with absolute certainty that the allegations of sexual misconduct between Mr. Komlosi and Mr. Rosenberg were false"—the box it had to check if it was to find in Komlosi's favor.

The jury returned a verdict in favor of Komlosi, which was ultimately upheld on the theory that Fudenberg, acting under color of law but unprotected by a qualified immunity, had violated his right to be free of malicious and baseless prosecution; the jury's $16 million award was reduced to $1,872,988 in compensatory damages plus $500,000 in punitive damages (*see Komlosi v Fudenberg*, 2000 WL 351414, 2000 US Dist LEXIS 4237 [SD NY, Mar. 31, 2000, No. 88 Civ 1792 (HBP)]).

Based on the jury's indication on the verdict sheet that Fudenberg "knew with absolute certainty that the allegations of sexual misconduct between Mr. Komlosi and Mr. Rosenberg were false," the Office of the Attorney General has taken the position that since Fudenberg knew with certainty that Rosenberg's accusation against Komlosi was false, she was engaged in intentional wrongdoing and was acting outside the scope of her employment, and accordingly, is not entitled to indemnification under Public Officers Law § 17 (3).

Komlosi challenges that determination in this hybrid declaratory judgment action and CPLR article 78 proceeding, brought in the capacity of Fudenberg's judgment creditor and the court-appointed receiver of Fudenberg's right to indemnification. The motion court set aside the Attorney General's decision denying indemnification as arbitrary and capricious, in view of the office's position throughout the federal action that Fudenberg had been performing her responsibilities in the course of her state employment. The Attorney General now appeals, contend-

ing that its determination declining to indemnify Fudenberg is supported by a rational basis based on the jury's finding.

I would affirm. Public Officers Law § 17 (3) (a) requires the State to indemnify its employees in the amount of any judgment obtained against such employees in any state or federal court, "provided, that the act or omission from which such judgment or settlement arose occurred while the employee was acting within the scope of his public employment or duties; the duty to indemnify and save harmless or pay prescribed by this subdivision shall not arise where the injury or damage resulted from intentional wrongdoing on the part of the employee." Therefore, to be entitled to receive indemnification, plaintiff must prove (1) that Fudenberg's actions occurred while she was acting within the scope of her public employment or duties; and (2) that Fudenberg's conduct did *not* constitute "intentional wrongdoing."

The first requirement is easily established here. An act is considered to be within the scope of an employee's employment if it "can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of that act" and "was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions" (*Riviello v Waldron*, 47 NY2d 297, 302, 303 [1979]). Here, Fudenberg's actions in bringing Rosenberg and his statement to the attention of senior personnel were done in the scope and context of her employment as a state-employed therapy aide. Staff at facilities like WRTC are affirmatively required to report actual or suspected abuse of residents (*see* Public Health Law § 2803-d; 14 NYCRR 624.2). They are not entitled to independently weigh the credibility or veracity of an accusation, and, indeed, the failure to report such a claim may even subject the employee to liability (*see e.g.* Social Services Law § 420). It is incontrovertible that David Rosenberg made such a claim in front of Fudenberg and two other staff members; the three employees had no choice but to bring Rosenberg's words to the attention of senior supervisory personnel.

To support its conclusion that Fudenberg engaged in intentional wrongdoing so as to preclude indemnification for her acts under Public Officers Law § 17 (3) (a), the State relied on the verdict sheet box checked off by the jury in the federal civil rights action in order to reject her qualified immunity defense. However, there are a number of reasons why we should not permit the State to use that purported finding to conclude that Fudenberg engaged in intentional wrongdoing.

Based on the law and the court's instructions to the jury in

Komlosi's civil rights action against Fudenberg, the only finding the jury was required to make if it decided to reject Fudenberg's qualified immunity defense was that Fudenberg had failed to satisfy her burden of proving that she did not know with certainty that the charges against Mr. Komlosi were false. Rejecting her qualified immunity defense did not require an affirmative finding that Fudenberg knew with certainty that Rosenberg's charges were false. Yet, the jury was given *no choice* but to check off that box in order to reject the qualified immunity defense and find in favor of Komlosi. In these circumstances, it is unjust to Komlosi to allow the State to rely on the flawed interrogatory and its unnecessary, but required "finding," to justify its refusal to indemnify.

Moreover, the credible evidence at trial in the federal civil rights action did not support a finding that Fudenberg had acted with the knowledge that the accusation was false, persecuting Komlosi out of some sort of personal animus against him unrelated to a belief that he posed a threat to the WRTC residents. Rather than maliciously manipulating residents into making completely false accusations against Komlosi, she was pressing *them* to come forward with accusations of things that she believed had occurred, based on her perception and interpretation of what she saw and heard. Review of the record makes it apparent that Fudenberg had a tendency to interpret innocuous statements and actions toward WRTC residents, especially by Komlosi, as proof of sexual conduct toward them. So, for example, when she saw Komlosi holding a resident's hand, closing his office door when speaking with a resident, innocently touching a resident or allowing a resident to touch him without fussing or protesting, she saw those actions as indicative of sexual conduct. She sincerely, if misguidedly, believed that by leading these residents to press what she perceived as their legitimate grievances of sexual abuse, she was protecting them. The belief she harbored—that she was heroically helping to protect the powerless residents from sexual predation—is reflected in her testimony and in statements reported in news articles, in which she reportedly said that she was motivated by the desire to protect the patients.

Even when, upon investigation and inquiry, these residents then disclaimed any actual abuse, Fudenberg still did not waver in her views and her interpretation of what she had seen and heard. She continued to see Komlosi's innocuous actions as indicative of abuse, to press the residents to make those accusations to bring him to justice, as she saw it, and to believe that when he was cleared of the charges, the determination was due

to professional bias or a poor investigation. From her perspective, she was not creating and orchestrating false charges by WRTC residents; instead, she was helping residents make the accusations that they hesitated to make without a tough advocate helping them.

The tenaciousness with which Fudenberg persevered in her misperceptions, regardless of Komlosi's being cleared after formal investigation, is underscored by remarks made by administrative and supervisory staff about her. In his deposition testimony, OMRDD investigator George Young indicated that when he reported that he was going to recommend that charges against Komlosi be dropped, John Sabatos, then Director of the Brooklyn Developmental Center, responded that "Melanie [Fudenberg] was not going to let me drop this." George Young also stated that when he reported his conclusions to Sheldon Kramer, the director of Employee Relations at OMRDD, Kramer said he "approached [Fudenberg] with caution."

The only direct evidence tending to support a conclusion that Fudenberg "knew" David Rosenberg's accusation to be false can be found in Rosenberg's recantation of his earlier testimony at Komlosi's criminal trial. However, his reported statement was certainly far from clear and open, and beyond establishing that his initial accusations against Komlosi were untrue, it should not be relied on to establish that Fudenberg knew his accusation to be false and nevertheless forced him to make it. While Rosenberg was reported to have said in his recantation that Fudenberg "forced" him to lie, he did not respond at all to the question of *how* she forced him, and he nowhere explained whether Fudenberg provided him with the lie he was to tell, or simply pressed him to repeat something he had already told her. Particularly when we recall that Rosenberg had previously used the word "forced" to falsely assert that Komlosi had "forced" him to participate in acts of oral sex with words alone and without touching him, there is no reason to take his assertion that Fudenberg forced him to lie to mean that she used force to get him to tell what she knew to be a lie about Komlosi. In all his earlier statements, Rosenberg said that Fudenberg had persuaded, or forced, him to come forward with his claim, not that she forced him to say something she and he knew to be untruthful. Therefore, Rosenberg's statement that Fudenberg forced him to lie, viewed in light of his previous inappropriate use of the word "forced" and his general inability to explain clearly what occurred, must be treated as merely establishing that Fudenberg pressed him to come forward with the claim that he now admits was untrue.

It would be improper to rely on earlier investigators' reports relaying hearsay statements reportedly made by other residents to the effect that Fudenberg had solicited accusations by them against Komlosi. Those second-hand statements, purportedly made by individuals whose reliability cannot be assumed in any event, cannot be used to justify a finding that Fudenberg knew there was no basis for the accusations she prompted against Komlosi. But, even assuming that we could rely on those hearsay reports to establish Fudenberg's actions and motivations, those second-hand accusations are better understood to establish only that in the cases of those residents, too, Fudenberg interpreted innocuous observations as reflective of abusive conduct by Komlosi, and took the steps she perceived to be necessary in order to coax or prompt those residents to make the accusation that she believed they were too frightened to report on their own.

Determining what goes on in someone's mind is unquestionably a virtually impossible task, yet, of necessity, we ask juries to make those determinations, using prescribed standards of proof and making inferences. If the jury in the civil rights action had necessarily made the determination that Fudenberg knew Rosenberg's accusation to be false, that determination could legitimately provide sufficient support for the denial of the requested indemnification. But, in order to reach its verdict, the jury did *not* have to find that Fudenberg knew the falsity of Rosenberg's assertions of sexual abuse by Komlosi. The only finding it had to make regarding Fudenberg's mental state, could have been limited to finding that Fudenberg's actions were brought in reckless disregard of Komlosi's rights. To the extent the jury's marking on the verdict sheet indicates a finding regarding Fudenberg's mental state, the State should not be permitted to rely on it because it was not necessary, it was not supported, and, most importantly, the jury was compelled to check that box in order to find for Komlosi.

The perplexing nature of Fudenberg's conduct may create the natural suspicion that she *must* have harbored tremendous personal animosity toward Komlosi, and that the way she kept pressing claims on behalf of WRTC residents after investigators and administrators had determined them to be baseless seems explicable only by the suggestion of personal animosity. Indeed, the legal theory of Komlosi's federal claim against her indicates that personal animosity, or a vendetta, was the only explanation he was able to proffer for Fudenberg's conduct toward him. However, the record before us includes one piece of information not provided to the jury, which Komlosi suggests helps, in retro-

spect, to explain why Fudenberg was so persistent in her certainty that her observations demonstrated that Komlosi was sexually abusing residents, and why she was so unable to consider that she might be incorrect. Specifically, for the first time in a deposition in 2002, Fudenberg admitted that she then was unemployed and receiving Social Security disability benefits since approximately June 2000, based on medical disabilities that she admitted included a bipolar condition (as well as back injuries, including sciatica and scoliosis, a thyroid condition, high cholesterol, and an irregular heart beat).

The mere mention of her diagnosis with a bipolar condition does not in itself permit this Court to come to our own medical conclusions that the disorder caused her misperceptions and self-aggrandizement. It does, however, raise some question as to whether Fudenberg's perceptions regarding Komlosi's conduct with the WRTC residents might have been related to a psychological disorder. Had Komlosi known of this diagnosis during the civil rights trial, he could have provided evidence of a motivation that did not involve a personal vendetta on Fudenberg's part.

In the civil rights action, Komlosi successfully navigated the shoals of proving that Fudenberg was acting under color of state law while *not* being entitled to a qualified immunity. Having done so, he is now faced with an unintended—and unfair—consequence of the positions he was forced to take. In order to obtain a jury verdict that Fudenberg was not protected by a qualified immunity, he had been compelled to take the position that she had knowingly pressed a false claim, and that finding is now being used to treat her actions as if they were taken outside of her capacity as a Mental Hygiene Therapy Aide. The State and its agencies, which defended Fudenberg every step of the way as having acted in the performance of her job responsibilities, now treat her actions as they would intentional conduct by a state employee that is unrelated to the perpetrator's employment. Not only do I fail to see the justification for this conclusion, but the decision seems to me to be cynical and disingenuous, an expedient position to take so that the State need not indemnify Fudenberg for the damage it put her in a position to create as an employee of WRTC.

When the evidence in the record is fully considered, the jury's indication of her purportedly "certain" knowledge of the falsity of David Rosenberg's accusation must be rejected as grounds to conclude that she engaged in intentional wrongdoing, and nothing else in the record justifies the conclusion. On the contrary, the evidence establishes that Fudenberg, however misguided, ir-

rational, or psychologically compromised, continued to believe herself to be acting for the protection of the residents from what she perceived to be a sexual predator. Based on those facts, the Attorney General's conclusion lacks a sufficient foundation, and Komlosi is entitled to the benefit of Fudenberg's right to indemnification.